**DAVIS, Director General, v. MARTIN.
(No. 9644.)**

(Court of Civil Appeals of Texas. Dallas.
June 12, 1926. Rehearing Denied
Oct. 16, 1926.)

**1. Carriers ⬤⟹202—Carrier, failing in duty to warn shipper of wheat embargo, was estopped to set up embargo to bar recovery by shipper of paid demurrage charges.**

Since defendant carrier, knowing of wheat embargo, was under duty to prevent plaintiff from loading cars in ignorance of embargo, failure to warn plaintiff estopped defendant from setting up embargo as bar to plaintiff's recovery of demurrage charges paid.

**2. Carriers ⬤⟹202—National Car Demurrage Rules and Charges held inadmissible.**

National Car Demurrage Rules and Charges, effective December 1, 1919, *held* inadmissible because irrelevant and immaterial to issue involved in suit for recovery of September and October, 1919, demurrage charges.

Error from Dallas County Court; Wiley Bell, Judge.

Action by H. G. Martin against James G. Davis, Director General. Judgment for plaintiff, and defendant brings error. Affirmed.

Gresham, Willis & Freeman and A. S. Johnson, all of Dallas, for plaintiff in error.

Wm. N. Flippen, John T. Gano, and Tom Fletcher, all of Dallas, for defendant in error.

VAUGHAN, J. The parties to this appeal will be referred to in keeping with the position they occupied in the trial court; i. e., the plaintiff in error as defendant, and the defendant in error as plaintiff, both for brevity and clarity.

This suit was instituted for the purpose of collecting from the defendants, the Texas & Pacific Railway Company, James C. Davis, United States Director General, Agent of Railroads, and United States Director General, Agent of the Texas & Pacific Railway Company, and J. L. Lancaster and C. L. Wallace, receivers of said the Texas & Pacific Railway Company, the sum of $336, which the plaintiff alleged that he was unlawfully required to pay to the defendants as demurrage.

The defendants answered by general demurrer, general denial, and special exception, and a detailed answer, alleging the existence of an embargo as the reason for the assessment of the demurrage charges, which answer will be reflected in the discussion of the case.

The cause was tried on the 22d day of November, 1924, before the court without the intervention of a jury, and judgment rendered on that date in favor of the plaintiff, and against the defendant James C. Davis, United States Director General of Railroads, and James C. Davis, United States Director General and Agent of the Texas & Pacific Railway Company, for the sum of $438.48, as demurrage and interest. Before judgment, plaintiff dismissed his cause as against the defendants, the Texas & Pacific Railway Company, and J. L. Lancaster and C. L. Wallace, receivers of said railway company.

The defendant duly excepted to this judgment and gave notice of appeal, and same is before us for review on appropriate assignments of error.

The several assignments really present but one question; i. e., whether or not the demurrage was properly assessed for the period of time from within the free time for the loading of cars, after they had been placed for loading, up to the time that the cars were removed by the defendant, October 20, 1919. There is no dispute as to the amount of the demurrage or of the authority of the defendant to assess the demurrage, under the tariff, if the demurrage was proper.

The trial judge, in rendering judgment for plaintiff, found the demurrage improper because the defendant had accepted the goods for shipment prior to the beginning of the accrual of the demurrage. We find the following material facts to have been established:

On the —— day of August, 1919, an embargo against shipments of wheat to the port of Galveston, Tex., was declared by duly constituted authorities, and on the 29th day of August, 1919, notice of said embargo was given at the main office of the Texas & Pacific Railway Company at Dallas, Tex.

On the 1st day of September, 1919, plaintiff requested the station agent of the defendant at Grand Prairie, Tex., to place two box cars on loading switch, in order that he might load them with wheat and have same shipped to Galveston, Tex. That defendant placed car No. 5919 at 7 a. m., on September 2, 1919, and car No. 116835 C. B. & Q., at 7 a. m., September 13, 1919, as per said request. That plaintiff had loaded the first car, and, while he was engaged in loading the second car, he made application to the defendant's agent at Grand Prairie for signed bills of lading covering said shipments of wheat to Galveston, Tex., at that time designating the consignee. The record fails to disclose the date this application was made.

The agent refused to issue the bills of lading, informing plaintiff of the existence of an embargo against shipments of wheat to Galveston. This was the first notice that plaintiff had received of the existence of said embargo, and the first and only mention of same made to him by agent of the defendant. The agent did not at this or any other time, on account of the embargo, direct the plaintiff to unload the wheat already loaded,

and to release cars to defendant; but said agent at that time told the plaintiff that the wheat could only be shipped by procuring a special permit from the proper authorities allowing said shipment to pass, through the embargo, and instructed plaintiff to procure such permit, designating the proper authorities to whom to apply.

Plaintiff proceeded to complete the loading of the second car, and never unloaded or released either car to the defendant. That, immediately after being informed of the embargo, plaintiff made proper application to the authorities controlling the embargo at Galveston, Tex., for a special permit to ship his wheat to that port. This was granted on October 20, 1919, on which date he made application to the agent of the defendant for bills of lading, and bills were issued on that date, and the shipments moved through the regular course of rail traffic to Galveston, Tex. At Galveston, Tex., demurrage charges were assessed by the agent of the defendant and paid by the plaintiff under protest, and without waiving any of his rights thereby, in the amount of $193 on car No. 5915 T. & P. and $143 on car No. 116835 C. B. & Q. The amount of demurrage charges so assessed and paid by the plaintiff are correct in amount.

That, from the time said cars were loaded, until the time they were started to Galveston, Tex., they remained on the side track at Grand Prairie, Tex., accessible to the plaintiff and to the defendant alike. That said embargo was binding on all carriers and shippers attempting to ship wheat to Galveston. That, although plaintiff made proper demand upon defendant for refund of the demurrage charges paid by him, the defendant refused such demand, denying all liability for the claim.

That the Texas & Pacific Railway Company and its properties were being operated and controlled by the government of the United States of America, under proper act of Congress, continuously from January 1, 1918, to January 22, 1920. That Walker D. Hines was properly appointed Director General of Railroads and Federal Agent on March 11, 1919, and served in that capacity until May 18, 1920. That James C. Davis was properly appointed Director General of Railroads and Federal Agent on March 20, 1921, and was at the time of the trial of this case in the court below still serving in that capacity. That plaintiff properly substituted said James C. Davis, as such Director General, for defendant Walker D. Hines, Director General and Agent of Railroads. The legal rights of the parties rest under these facts.

[1] It was not due to any negligence of or default on the part of the plaintiff that he found himself in an embarrassing position in reference to the shipment of his wheat after it had been loaded, but to the failure of defendant, acting through his constituted agent, to make known to plaintiff the existence of the embargo on the shipment of wheat to the port of Galveston. By the act of defendant in placing the cars at plaintiff's disposal, he had the right to assume that the shipment would be made in due time; that is, would move forward to point of destination as soon as the grain intended for shipment should be loaded. The part of this engagement to be performed by plaintiff was to apply for and obtain the placement of the cars necessary to ship his grain, the loading of the grain, and the application for bills of lading. The part to be performed by defendant was the placing of the cars, the issuing and signing of bills of lading for the wheat when it was advised that it was loaded, and then to move cars with due diligence to destination. Therefore no duty rested upon plaintiff to ascertain whether or not defendant was in position to and would discharge his part of the undertaking for the transportation of the wheat from Grand Prairie to Galveston, Tex.

The placing of the cars was sufficient to induce plaintiff, who was without knowledge of the embargo, to believe that defendant was in position not only to receive for shipment, but to transport and deliver his wheat in Galveston in due course of the movement of freight by defendant, and was thereby induced to make use of the cars so placed for the loading of his grain. But for this inducement, there can be no question that he would not have loaded his grain in the cars, expecting same to be transported to Galveston.

On defendant, with knowledge of the existing embargo, acceding to plaintiff's request for the cars to be placed, there arose a contract between the parties whereby the defendant agreed to place two cars on the loading switch track for plaintiff, and to place same in transit for Galveston as and when the plaintiff should load. At this time the defendant knew, and therefore we are to assume that the agent representing defendant in this transaction with plaintiff knew, of the existence of the embargo on the subject-matter of this contract to Galveston, the point of destination in the agreement as made between the parties. Under this relation of the parties, there devolved upon the defendant the duty of informing plaintiff of the existence of the embargo and refusing to place the cars for the plaintiff, or to discharge the obligation assumed by defendant, as a part of the contract of shipment to obtain the permit for said wheat to go forward, without any additional obligation being thereby placed upon plaintiff.

Under the law, as same has been developed from time to time applicable to common carriers, the existence of certain conditions or circumstances will justify a common carrier in refusing to accept a shipment offered. These conditions occupy a well-defined posi-

tion in the law, and, where one of them exists at the time a shipment is offered to the carrier, it is authorized on account thereof and protected by the law in refusing such shipment for transportation. However, the carrier, under the law, cannot refuse to accept a proffered shipment if there does not exist at the time the shipment is offered conditions, either at common law or by statutory law, on which such refusal could be based. In this case, the embargo was such an excuse because it was pursuant to law and was imposed by the properly constituted authorities. Therefore, at the time plaintiff requested the defendant to place the cars for loading wheat to be shipped to the port of Galveston, the defendant had a valid legal excuse for both refusing to spot the cars and receiving plaintiff's wheat for transportation to Galveston. The defendant therefore owed the plaintiff the duty to inform him of the existence of the embargo when plaintiff requested the cars, to the end that he would not change his position to his detriment; for it is to be assumed that had the plaintiff been notified of the existence of such an embargo at the time he applied for the cars, he would not have gone to the trouble and expense of loading the cars with wheat· with the knowledge of the fact that same could not be forwarded for delivery.

From these facts it follows as a logical deduction that, at the time plaintiff requested the cars in question, defendant's agent having knowledge of the existence of the embargo on the shipment desired to be made, the withholding by him of such information through his acts and conduct in not disclosing same to plaintiff operated to estop defendant from setting up that embargo for any purpose, whether to receive the wheat or to forward same; as when the cars were placed, defendant had notice that such cars were to be loaded with wheat to be shipped to Galveston as the point of destination. Therefore defendant waived the protection which the existence of the embargo gave him to refuse the shipment, and the placing of the cars had the effect, notwithstanding the existence of the embargo, to create the agreement on the part of the defendant to forward the shipment to Galveston, as if the embargo did not exist; therefore, to permit defendant to plead this embargo against plaintiff's right to recover the demurrage paid would be inequitable and unjust.

We do not think the facts show that defendant had the right to charge and collect the sum that was exacted from plaintiff as demurrage, on account of the detention of the cars in question.

[2] The defendant offered and the court admitted in evidence the National Car Demurrage Rules and Charges, effective December 1, 1919; said rules and charges show on their face to have been approved by the Interstate Commerce Commission on October 18, 1919, approved by the American Railway Association November 19, 1919, and effective December 1, 1919. The matters involved in the case at bar arose between September 1 and October 20, 1919. We are, therefore, of the opinion that said rules and charges are immaterial and irrelevant to any issue involved in this case, and therefore, regardless of their purport, should not be received as evidence bearing upon the rights of the parties.

We are of the opinion that the proper judgment was rendered by the trial court, and that same should be in all things affirmed.

Affirmed.